930 F.2d 1310
 1991-1 Trade Cases 69,403
 PARAGOULD CABLEVISION, INC., Appellant,
v.
CITY OF PARAGOULD, ARKANSAS; Paragould Light & Water
Commission; Charles Partlow; Don Perkey; Douglas J.
Smith; Tim Wooldridge; Ben Branch; Phyllis Dees; Jay W.
Dortch; Frank Gatlin; James Inness; George Cook; Jeptha
Futrell; Jerry Jetton; William Brewer; and Mack Shotts, Appellees.
 No. 90-1820.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 26, 1990.
Decided April 15, 1991.
Rehearing and Rehearing En Banc Denied
June 18, 1991.
 
 Bruce Solker, Washington, D.C., for appellant.
 Robert Thompson, Paragould, Ark., and W. Randolph Young, Washington, D.C., for appellees.
 Before ARNOLD, Circuit Judge, FLOYD R. GIBSON and HEANEY, Senior Circuit Judges.
 HEANEY, Senior Circuit Judge.
 
 
 1
 Paragould Cablevision (Cablevision) appeals from the district court's grant of the City of Paragould's (Paragould) and its Light and Water Commission's (CLW) motions to dismiss Cablevision's claims pursuant to Fed.R.Civ.P. 12(b)(6). 739 F.Supp. 1314. Cablevision charged Paragould with violations of the Sherman Anti-Trust Act,[1] infringements of its first and fourteenth amendment rights, and breach of contract. The district court dismissed the federal claims with prejudice and then dismissed Cablevision's state-law contract claims without prejudice pursuant to United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). We affirm.
 
 FACTS
 
 2
 In December 1983, Cablevision entered into a cable television franchise agreement with Paragould. The agreement runs through 1993, with provisions for two five-year extensions. The franchise agreement is expressly nonexclusive. Despite this stipulation, Cablevision initially did not face any competition in the Paragould cable television market. However, in response to dissatisfaction with Cablevision's services, the voters of Paragould approved an ordinance in June 1986 authorizing the CLW to construct and operate a municipally owned cable television system. To finance the system, the residents of Paragould passed an October 1989 referendum which authorized Paragould to issue $3.22 million of municipal bonds. In January 1990, Paragould authorized the bonds to be issued. Later that month, Cablevision filed this suit against Paragould, the CLW, and various officers of these entities. As noted, the district court dismissed Cablevision's federal claims for failure to state a cause of action upon which relief could be granted and declined to exercise pendent jurisdiction over Cablevision's contract claims.
 
 DISCUSSION
 
 3
 Cablevision appeals the district court's dismissal of its antitrust and constitutional claims.
 
 I. Antitrust Claims
 
 4
 In a series of cases culminating in Town of Hallie v. City of Eau Claire, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Supreme Court established that "before a municipality will be entitled to the protection of the state action exemption from the antitrust laws, it must demonstrate that it is engaging in the challenged activity pursuant to a clearly expressed state policy." Id. at 40, 105 S.Ct. at 1717. More specifically, to withstand an antitrust challenge, the municipal conduct must be supported by "a clearly articulated and affirmatively expressed state policy." Id. at 44, 105 S.Ct. at 1719. In implementing this law, this circuit has explained that "the state policy to displace competition can be inferred 'if the challenged restraint is a necessary and reasonable consequence of engaging in the authorized activity.' " Scott v. City of Sioux City, 736 F.2d 1207, 1211 (8th Cir.1984), cert. denied, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985), quoting Gold Cross Ambulance & Tran. v. City of Kansas City, 705 F.2d 1005, 1013 (8th Cir.1983). A municipality is therefore subject to searching antitrust scrutiny and can defeat antitrust challenges only if the anticompetitive consequence necessarily and reasonably results from engaging in the authorized activity. Importantly, "the Supreme Court has made clear that 'a specified, detailed legislative authorization' of monopoly service need not exist to infer the necessary state intent. City of Lafayette v. Louisiana Power & Light Co., [435 U.S. 389, 415, 98 S.Ct. 1123, 1138, 55 L.Ed.2d 364 (1978) ]. It is sufficient that 'the legislature contemplated the kind of action complained of.' Id. (citation omitted)." Gold Cross Ambulance & Tran. v. City of Kansas City, 705 F.2d 1005, 1012 (8th Cir.1983).
 
 
 5
 In a recent opinion, the Supreme Court suggested in dicta that there may be a market participant exception to state immunity. See City of Columbia and Columbia Outdoor Advertising v. Omni Outdoor Advertising, --- U.S. ----, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991).[2] As yet, however, the market participant exception is merely a suggestion and is not a rule of law. Until such a transformation occurs, we will continue to use the necessary and reasonable test established by this circuit.
 
 
 6
 Cablevision concedes that Arkansas law permits Paragould and the CLW to enter into the cable television business.[3] Cablevision objects, however, to both the method chosen to effectuate this entry, and to what it alleges is Paragould's predatory intent to destroy competition. Cablevision claims that by granting cable television rights to the CLW, Paragould has facilitated "monopoly leveraging," which has been defined as "the use of (1) monopoly power in one market to (2) restrain competition in a second market." White & White, Inc. v. American Hosp. Supply Corp., 723 F.2d 495, 506 (6th Cir.1983). Cablevision objects to the potential for the CLW to exploit its monopoly status in supplying utilities to drive Cablevision out of the Paragould cable television market. Cablevision argues that this potential exploitation exposes the predatory intent of Paragould and the CLW. According to Cablevision, this intent violates antitrust law because, although the statutes at issue allow a municipality to become a competitor in the cable television industry, they do not allow the municipality to place limitations on private competitors. Cablevision argues that its inability to engage in the monopoly leveraging which Paragould will permit the CLW to exploit results in Paragould placing a de facto limitation on Cablevision.
 
 
 7
 The district court rejected Cablevision's arguments. Characterizing the relevant statutes as "broad," "sweeping," and "comprehensive," the district court concluded that these statutes authorized Paragould to develop its own cable television system, despite the anticompetitive implications of Paragould's particular conduct. We affirm the district court's decision, particularly in light of the voluminous case law reaching similar conclusions. See, e.g., City of Columbia and Columbia Outdoor Advertising v. Omni Outdoor Advertising, --- U.S. ----, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (city is immune from antitrust liability where its restriction of competition is a foreseeable result of implementing action authorized by state law); L & H Sanitation v. Lake City Sanitation, 769 F.2d 517, 522 (8th Cir.1985) (holding state action immunity doctrine applicable to a city's award of exclusive solid waste disposal franchise); Gold Cross Ambulance & Tran. v. City of Kansas City, 705 F.2d 1005, 1007 (8th Cir.1983) (holding defendants "shielded from federal antitrust liability because they established the municipal ambulance system pursuant to state authorization and a clearly articulated and affirmatively expressed state policy to displace free competition in the ambulance business").[4]
 
 
 8
 Arkansas has clearly authorized municipalities to enter into the cable television business. See supra note 2. Municipalities generally enjoy access to extant governmental infrastructure such as utility poles and rights of way. When a municipality, such as Paragould or its entity, the CLW, enters into the cable market, it necessarily will benefit from this access. Thus, by virtue of their status, Paragould and the CLW do not have to build their cable television operations from scratch. Presumably, rent-free office space is available, employees and "executives" are already hired and presently serving in other capacities, trucks and equipment to service cable needs are available, demographic information has been compiled and computerized, rights of way have been secured for other purposes, and utility poles are already standing. If the Arkansas legislature did not intend the utilization of these resources and the resultant benefit of being able to supply cable services with diminished overhead costs, it would have tailored the enabling statutes accordingly. Because of the nature and extent of municipal operations, the displacement of competition necessarily results whenever the state authorizes municipalities to enter into an industry with monopolistic tendencies.
 
 
 9
 We hold that a sufficient state policy to displace competition exists here since the challenged anticompetitive restraint is a necessary and reasonable consequence of Paragould's statutorily authorized entry into the cable television business. Accordingly, state action immunity attaches to the acts of Paragould and the CLW with respect to their development of a cable television system, and the district court properly granted their 12(b)(6) motions.
 
 II. Constitutional Claims
 
 10
 Cablevision also objects to the district court's dismissal of its first and fourteenth amendment claims. Cablevision specifies three first amendment violations. First, according to Cablevision, a provision of the franchise agreement between it and Paragould infringes its commercial free speech rights by requiring Cablevision to notify and gain the approval of Paragould before soliciting advertising to air on its system. The relevant provision, Section 2.4 of the franchise agreement, stipulates:
 
 
 11
 This agreement does not cover major technical advances in TV reception and use, in cable TV or in TV-related technology such as, but not limited to, two-way capability, teleconferencing, or use of inexpensive individual satellite receivers or components thereof. It does not cover additional income-producing activities of [Cablevision] such as advertising over [Cablevision's] cable TV system. If [Cablevision] should decide to offer services to subscribers involving these or other major technical advances or to undertake other income producing activities, it will first notify the City and offer its proposed modification to this Agreement to cover such additional services and activities, and the proposed modification shall be subject to negotiation.
 
 
 12
 Second, Cablevision argues that the franchise agreement between the CLW and Paragould, which contains no restriction on income-producing activities such as advertising, violates the first and fourteenth amendments by favoring certain speakers over others. Because Section 2.4 limits Cablevision's ability to engage in commercial speech, and because the CLW is not similarly restrained, Cablevision claims that this differing treatment infringes both its first amendment free speech and its fourteenth amendment equal protection rights. Finally, Cablevision maintains that Paragould will permit advertising only if a portion of the advertising revenues is included in the franchise fees paid by Cablevision to Paragould. The CLW is not similarly burdened. Cablevision claims that this selective imposition of a franchise fee constitutes a discriminatory media tax, whereby one member of the media suffers from differential taxation relative to its competitors. See Minneapolis Star & Tribune v. Minnesota Commissioner of Revenue, 460 U.S. 575, 578-79, 103 S.Ct. 1365, 1368-69, 75 L.Ed.2d 295 (1983).
 
 
 13
 After reviewing each of these arguments, we affirm the district court's dismissal of Cablevision's constitutional claims. First, we agree with the district court's judgment that Section 2.4 "is contractual in nature...." Nonetheless, we recognize that Paragould's alleged insistence on honoring the terms of the contract does indeed inhibit Cablevision's ability to air commercials, and thus limits free speech in the purest sense. See Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, 447 U.S. 557, 561, 100 S.Ct. 2343, 2348, 65 L.Ed.2d 341 (1980). By entering into the franchise agreement, however, Cablevision effectively bargained away some of its free speech rights. Cablevision could have bargained for an unqualified right to solicit and transmit advertisements. No law mandated otherwise. Cablevision simply failed to protect its commercial rights. Presumably Cablevision received consideration in return for this sacrifice, but apparently what was once considered a satisfactory bargain has turned into a sour deal. Regardless, Cablevision cannot now invoke the first amendment to recapture surrendered rights.
 
 
 14
 Without a finding that Section 2.4 implicates constitutionally protected free speech rights, Cablevision's second argument that Paragould's franchise agreement with the CLW unconstitutionally favors the CLW by not including a provision similar to Section 2.4 collapses. Cablevision contends that the dichotomy between the two contracts creates an equal protection problem involving first amendment rights. In making this distinction, Cablevision forgets that it bargained for its franchise agreement. Cablevision voluntarily entered into the franchise agreement, presumably for its own economic gain. The forum for protecting its free speech rights was the bargaining table, not the courtroom seven years later.
 
 
 15
 Cablevision's allegation of a discriminatory media tax also lacks merit. We are inclined to agree with the district court that this claim is premature. As yet, Paragould has not extracted any sort of "advertising fee" from Cablevision nor has Cablevision submitted any convincing evidence to support the imminency of such a fee. Hence, a justiciable controversy for Article III review does not exist. However, because we are reviewing Cablevision's claims pursuant to a motion to dismiss, we will accept its allegation of a media tax as true. Even when we accept this issue as being substantively ripe, we again hold that Cablevision bargained for its position and therefore must comply with the terms of the franchise agreement.
 
 III.
 
 16
 The district court properly granted defendant's motions to dismiss Cablevision's antitrust and constitutional claims with prejudice. We also affirm the district court's refusal to exercise jurisdiction over the pendent state contract claims, which the trial court appropriately dismissed without prejudice.
 
 
 
 [1]
 15 U.S.C. Sec. 2 (1988)
 
 
 [2]
 The Court voiced this suggestion on two occasions in its opinion: "[T]his [antitrust] immunity does not necessarily obtain where the State acts not in a regulatory capacity but as a commercial participant in a given market." "We reiterate that, with the possible market participant exception, any action that qualifies as state action is 'ipso facto' ... 'exempt from the operation of the antitrust laws.' "
 (Citation omitted).
 
 
 [3]
 The relevant statutes provide:
 14-199-601. Authority of municipalities generally--Nonliable.
 (a) Any first-class city, second-class city, and incorporated town may own, construct, acquire, purchase, maintain, and operate a television signal distribution system for the purpose of receiving, transmitting, and distributing television impulses and television energy, including audio signals and transient visual images, to the inhabitants of the city or town and to the inhabitants of an area not to exceed two (2) miles outside the boundaries of the city or town.
 (b) In no case shall a city or town be held liable for damages for failure to furnish or provide the service.
 Ark.Stat.Ann. Sec. 14-199-601 (Supp.1989).
 14-199-602. Appliances, fixtures, and equipment authorized.
 The city or town may erect, construct, operate, repair, and maintain in, upon, along, over, across, through, and under its streets, alleys, highways, and public grounds, poles, cross-arms, cables, wires, guywires, stubs, anchors, towers, antennas, pipes, connections, and other appliances, fixtures, and equipment necessary, expedient, or useful in connection with a television signal distribution system.
 Ark.Stat.Ann. Sec. 14-199-602 (Supp.1989). See also, Ark.Stat.Ann. Secs. 14-164-303 & 309 (1987), which authorize municipalities to issue capital improvement bonds.
 
 
 [4]
 The Supreme Court's recent decision to grant municipalities immunity against being sued when they award local monopolies to private businesses also supports our holding